when we need it. And if we have scheduled a case for oral argument, you can rest assured we think that that will assist us in the resolution of the case. So that's what we're here for. Please do not treat the red light as aspirational this morning. When it shines, if you're answering a question from the court, feel free to finish your answer, but do respect the court's time. So we'll begin with Stout versus the Jefferson County Board of Education. Mr. Clemon, will you please come and speak to us? Good morning. Good morning. May it please the court. I'm UW Clemon of Birmingham, one of the counsel for the Stout plaintiffs. I will argue unitary status and racial motivation and co-counsel Monique Lynn Luce of the Legal Defense Fund will discuss the thwarting of the Jefferson County desegregation plan if Gardendale withdraws. I'm going to argue for five minutes. She'll take five and we'll reserve five minutes for rebuttal. In the outset, we want to make it clear that we deeply appreciate the hard work and dedication of the district judge in this case. Under her direction and guidance, we expect to submit a proposed consent decree, final consent decree, for her approval by August of next year. With respect to the unitary status argument of Gardendale... I guess what I had a hard time understanding, I read the district court's orders and the big order, the first order that I read, I was having no difficulty following until I got to the end. Then I wondered what the heck happened. I had no trouble following this order and understanding the order. Then all of a sudden, the district court granted something that, from what I can at least, no party asked for. Is that right? Yes, Your Honor. The first 173 of the 183 pages of the district court's opinion are all basically in our favor. It's only the last 10 that got us in trouble and brought us to this court. With respect to unitary status, everybody other than the Gardendale Council, and that includes the Jefferson County Board of Education, the Justice Department, the stout plaintiffs, and even the superintendent of the Gardendale school system, all agree that unitary status has not been achieved. The Supreme Court had the opportunity five years after... This court has said that, right? Well, this court said it in 1976, but it really didn't say... No, no, no, no, no. Since then, this court has... Yes, yes, sir. This court has said that... Unitary status does not mean that this case, that the county school system has achieved the unitary status that would mean that it's no longer in need of supervision of the federal court. Isn't that right? Yes, sir. Your Honor, Mr. Justice White once wrote that, "...the Constitution cannot control racial prejudices, but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot directly or indirectly give them effect." That was in the Palmer v. Thompson dissent and in the City of Claiborne, Texas v. Claiborne Living Center. The district court properly found that the Gardendale City Council acted for the purpose of effecting the desires of white citizens, that racial considerations were a motivating factor behind those desires, and the evidence clearly shows that members of the City Council were aware of the motivations of the private citizen. Should we reach that issue? Well... If we were to say, as I understand it, the district court made two findings that are subject to review for clear error. Yes, sir. One is that the Gardendale school system had been motivated by discriminatory purpose. Two, that their motion to create a separate school system would impede the accomplishment of the desegregation of the Jefferson County schools. Affirming on either ground would be sufficient, wouldn't it? Do we need to reach the discriminatory purpose issue? Well, Your Honor, in all candor, it is not necessary to reach that issue because the Wright and the Stout case. And we could do it either way. We could find a discriminatory purpose, too, and that would be the end of the matter, wouldn't it? Yes, sir. That's certainly true. And we simply want to point out that the Gardendale founding fathers did not invoke state action. And for the Gardendale board to say that we can't look at what they did and said is much like saying that we can't look at the Federalist Papers to decide the meaning of the Constitution. Because when they were adopted, the Constitution had not been ratified. Mr. Clement, if we were not to reach the independent 14th Amendment violation issue, as the Chief Judge and you were discussing, as being not necessary. And then forward three or four years, the Gardendale came forward with another plan for splinter, for separation. And a challenge was made to that. And in connection with review of that future plan, the district court judge was to rely on her finding of the independent 14th Amendment violation, in this case, for how she treated the next case. Would the legitimacy of the, would the question of the 14th Amendment violations in front of us today still be ripe for review on appeal in a later case? Well, if I made myself clear, if what you're suggesting is that Gardendale, at some point after unitary status has been achieved by the Jefferson County School Board. No, I'm well, whether after or before, regardless of whether unitary status has been achieved, let's assume three years from now, unitary status hasn't been achieved and Gardendale comes with another plan. Yes, sir. And they come with another plan that's a little different. And the district court judge says, listen, I taxed you with a violation of the 14th Amendment three years ago, and I'm still have power to review your plan in the light of that violation. Yes, sir. And then if she did that and Gardendale said, and Gardendale didn't like the results of her order and appealed up here and said, listen, we now want you to review whether we were guilty of an independent 14th Amendment violation four or five years ago. Is that issue still alive if we don't reach it today? Well, her finding would stand whether, if you chose not to address it. But what I'm concerned is whether or not it would be fair game for Gardendale, the town, three or four years from now to come back and say to an appellate court, remember us from three years ago, remember that record we made? Because as you know, Gardendale is now challenging whether or not there was clear error in the judge's finding of an independent violation. That record will still be extant four or five years from now. Yes, yes, sir. It will be. And Gardendale couldn't make that argument. Thank you. Thank you. Ms. Lynn Luce. And if I didn't pronounce it correctly, please correct me. May it please the court, Monique Lynn Luce for the plaintiff appellants, all black school children through their parents of Jefferson County. As Judge Pryor noted before, there are two bases independent on which the district court found that found a violation of Gardendale with Gardendale separation. I will discuss the second, which is the failure of Gardendale to reach its burden under clear and binding precedent of right and its progeny. Can we follow up on what Judge Clevenger was asking? It would seem to me in that kind of hypothetical scenario, which the district court seemed to be greatly concerned about, you know, something that is a remote and to me kind of speculative concern. But I would think that if years down the road, there were another attempt to create a separate school system, that any evidence about what happened with respect to this motion to separate could be considered under Arlington Heights as part of kind of the mosaic of circumstantial evidence, but that Gardendale would also be able to explain years later, presumably, why whatever happened before is not what is motivating them then. And all of that would just be in the mix. And whatever finding a district court would make, and assuming that Jefferson County has achieved unitary status at that point, if that's the circumstance, might not even be the same district judge. But in that event, the district court would be able to evaluate it and make a find. It would have to be a new finding about discriminatory purpose. Isn't that right? I believe I agree, Your Honor, that what we found and believe the court found with the independent violation of Constitutional 14th Amendment of intentional discrimination is a finding that if this court allows to stand, would be something that would be relevant in any future efforts by Gardendale to see, of course, Relevant, but not determinative. Not determinative. No, it would have to be if it's not adjudicated at this stage and affirmed at this stage, it would have to be dealt with at a later stage or could be brought up by either party. Even if it were adjudicated at this stage, right? Absolutely. The history of it still exists, particularly under Arlington Rights, as the court noted. Right. And it would be relevant, but still not even determinative then. Isn't that right? Yes, I believe that is correct. At that time, it would be not determinative, but it would be, I think, extremely prejudicial to the motivations at the time. Absolutely, it would be highly relevant and prejudicial. I get it. Yeah, but I do think that because there are these two independent bases that the court reached that both of them are valid and it provides a basis for enjoining Gardendale from operating a school district at this time. The court should reverse because according to Binding President, the district court's order was an impermissible remedy to cure the district court's finding that Gardendale's succession would have an adverse impact on the desegregation of Jefferson County. Under the district court's rationale, the district court would say, and I think does explain, that the court would be entering a new separation order. In other words, not the plan that Gardendale proposed, which it found to be interfering with the implementation of desegregation. Isn't that right? Your Honor, if I understand your question correctly, you're describing a new Gardendale plan sometime in the future that would be implemented? Well, I think that's what the district court is saying. We will have a new plan and that will not interfere with the implementation of the... The plan that the district court devised. Ah, correct, yes. Okay, so the plan that the district court devised, as Judge Prior noted earlier, is not one that any of the parties requested, and particularly we don't believe that the court had the authority to order such a remedy. Under Wright, the Supreme Court was very clear that if a school district, a separating school district, may not be created, if... Well, that's the point on which the district court judge disagreed with you. She read the word may in Wright to give her some discretion. The language in Wright is, in the exercise of its remedial discretion, the district court may enjoin the separation plan from going forward. And we believe that the court misapprehended the law in that case, that we feel it's very clear under Wright that there are no options. We believe that neither this court nor the district court has a choice but to enjoin the secession of Gardendale School District because the finding... Does Wright cover the circumstance in which you don't simply have a splinter group separating from a school system, you have an independent 14th Amendment violation in the motivation? I mean, does the violation of the 14th Amendment in connection with the school plan afford the district court a broader range of discretionary remedies? And does Wright address that specific issue? In Wright, the issue is not addressed on the question of intentional discrimination. That was not the basis. And in fact, what Wright says is that you don't have to... It's not the purpose of the separation. Well, Wright was saying even if there's a perfectly innocent motive, if there's an adverse effect on, then you can't do it. But what I'm trying to ask is whether or not this district court, I believe, felt that it had a kind of special form of authority to operate here because she was going to not only cure the violation in her mind, but she was going to produce a plan that would have a minimized impact on the county. And she viewed her situation as somewhat unique. I think that's clear from her opinion. Yes, Your Honor. So my question is whether or not Wright... Whether it's really the shoe that fits the foot here. I believe that Wright definitely fits squarely here. I think what Your Honor is describing is a situation where in which somehow the finding of intentional discrimination provides more leeway in determining an outcome. But we feel that the finding of intentional discrimination also bars Gardendale from operating. That would be an issue of first impression, wouldn't it? I couldn't find any precedent anywhere where you had this circumstance of a separation plan where it's remote in time from the original problem that was created in the county system. And a district court is trying to balance in a discretionary fashion the answer to both the independent violation question as well as the harm to the county's question. I would point the court to Lee v. Chambers County in 1994, which is a decision of the Middle District. But in that situation, it's 1994, the original violation was found in the 1960s, similar facts pattern to here. But there, the court found that the adverse impact was sufficient. And the facts align much as they do here in this case, that that was sufficient to enjoin the school district from separating from the county. I just closed the circle on what I was saying. I'm sorry to interrupt. In my court, unfortunately, we're less polite than you are down here. No worries. I just want to make sure I answer your question. You haven't sat with enough of our panels. To me that the law of this circuit is really quite clear that in the event that a finding of fact is made and is supported, that there will be an adverse effect on the county, so to speak, here and then there's no discretion. You have to reject the plan. So it seemed to me that this line of argument, discussion I was having with you, that circuit would have to make new law. That's exactly correct. To say this circumstance is different. That's exactly correct. Because this case fits so squarely with both the law of the case in Stout, with Wright, and with all subsequent 11th Circuit precedent. If there's a finding, as there was here, that there would be an adverse impact, as the court said, there could only be one option. In chambers, It's hard to understand what the authority, where it would come from. I mean, if someone's come before the court to create a new school system and the district court finds that the plan has a discriminatory purpose and alternatively would impede the desegregation of the county school system, I don't know what would empower the district court to fashion some kind of equitable relief that's a middle ground. I don't believe that. Where does that come from? We could find no basis in it. The law is so clear that once the decision has been made and the finding of adverse impact, that's the end of the court's equitable sort of authority and review. The court has to determine. Let me ask a housekeeping question. So the district court said that the county and Gardendale could go ahead and start taking steps toward the creation of this new school system. Has that happened? What's happening? To the extent that the record would tell us or anything else. So what has occurred is that the judge high court, the district court, stayed the portion of the order regarding Gardendale's activities and moving towards a separate school system, but then allowed the important work that actually all of the parties, the United States, the plaintiffs and the Jefferson County were pursuing earlier, which was actually fashioning a new desegregation plan that would move Jefferson County towards unitary status. So that process is moving forward. And under the court's order, we should have a plan in place by next August of 2018 that would then sort of show, you know, Jefferson County, what are the remaining issues to reach to get to unitary status. Have a plan. When you say there'll be a plan, you expect a plan to be presented by August of next year. But that's also, it's not your expectation that the litigation would end in August, only that a consent decree would be presented for the court's consideration. And if adopted, would take some time thereafter to implement. Absolutely. Underbinding Supreme Court precedent, that is the way in which a desegregation case is resolved, that a plan must be put in place to remove the vestiges of the prior system. To the extent practicable, the parties are clear that there are some things, including Jefferson County, that they still have, are non-compliant on and need to address. And what is frustrated, that process, has been Gardendale secession and the prior secessions, which the court found that have created both demographic, financial, and geographic disruptions that would actually allow Jefferson County to have a moment in time that we could actually pause, evaluate what needs to be done, create a plan, and move forward. But with the secessions, that becomes really impossible to do. To come back to your argument in chief, you're sharing with Mr. Clement, well, what in your view is the most significant data point for the adverse effect on the county's ability to become unitary? Absolutely. Can you just tell me the fact data points, whether it's the high school or the way in which the students are going to move? I think it's sort of three, there's three categories, and I'll give you the highlights of each one, if that works. The first is the demographic changes that the separation would create. And those are, that essentially, Gardendale would be a white enclave school system within a much more diverse, larger Jefferson County. That it would change the demographics of the entire Jefferson County. More white than it is now? Yes, it would be more white. Gardendale would be more white than Jefferson County by about 20%. So it essentially carves out a sort of a section of Jefferson County that has more white students. Isn't it already more white than Jefferson County? It absolutely is. But how much more white is it going to be than not? So it'll be, if it takes just the students that are within it, it'll be right around 25%, which is about where it is now. But Jefferson County as a whole becomes more African American, less white. And then it now creates, essentially, a separate system. Of course, part of the problem is that the plan is so uncertain that it's hard to really say, to answer that question, isn't it? It is. And the other thing that, what you do lose as a part of that demographic shift, one is you lose the opportunity for transfers, and you lose the opportunity of using the high school and other schools as tools of integration, or tools of desegregation, which is what the court found, that the high school, because of its geographic location, because of the high quality state-of-the-art programs, serves as a desegregation tool, because it brings students from around the area into this effectively integrated high school. But you lose the opportunities for any further desegregation by the carving out of Gardendale. The court noted that there is some uncertainty. However, the certainty, though, is we can look at the impact of the prior separations, and we can see that the prior separations have had a detrimental impact on the county, has had a significant impact in loss of resources. I don't want to cut you too short, but I think if you're going to refer, if you're answering Judge Clevenger's questions, so I think we need to move on to the data points and make sure we've wrapped that up. Sorry, Your Honor. The other point would be the message of inferiority. Right allows not just in looking at demographic changes, but also looks at the timing and the message of the separation. And here, the message of inferiority is clear. Black children are described as a bitter pill that Gardendale will be forced to swallow. There's no ambiguity in the meaning of that. And any ambiguity, the court found on page 177 of its order, of the flyer that was used in the motivation of the, for the tax to allow the creation of Gardendale, said the court found any arguable ambiguity in the flyer is resolved by the blatant public statements from separation organizers that we don't want to become what Centerpoint has become, which is an African-American community, and we need to separate to provide the control over the geographic composition of the student body. The statements made are clear. The timing of the message and the separation are clear. This school district was created to exclude African-American students. And that message of inferiority, regardless of whether it's two schools or 20 schools, will be clear. Okay, thank you. Since you were answering a question from the court, well, you've saved your five minutes for rebuttal. But let's hear from Mr. McCloud. Thank you, Your Honor. Thank you. May it please the court, in Freeman v. Pitts, the Supreme Court said that local autonomy of school districts is a vital national tradition. There are two points I'd like to address today as to why it was wrong for the district court to obstruct Gardendale's effort to take part in that tradition. First, the finding as to a substantial adverse impact or impediment to the county's desegregation efforts. And second, the finding of racial motivation. As to the first, the lower court found, and this is explained in the supplemental opinion, only two adverse impacts on the county's desegregation. First, the transfer of roughly 600 students out of about 33,000 county student enrollment from schools in Gardendale to schools elsewhere in the county. And second, the transfer of the high school itself. As to the first finding... The high school is a big factor, isn't it? It certainly is, Your Honor. And I will address that one first, if you would like. To me, it's probably your biggest problem on this point. It seemed to me that the district court was entitled to find that that high school was playing a critical role in the desegregation effort of the county school system. Particularly as that high school plays a role in vocational training that is designed to bring students from a larger portion of the county there. And as a result, it enhanced the desegregation efforts. What do you say about that? Well, Your Honor, you're correct that that was a central concern of the district court. There are two reasons why I think it was error for her to impose, for the court to impose the price or the bounty on the high school and to address what you just raised first. Well, is there evidence to support that finding? That it does play, that the high school plays that role? Well, yes, Your Honor, the high school does. But the problem with that finding is it was a straw man for the district court to find that the transfer of Gardendale High School to the new system would be a loss somehow to the county's ongoing desegregation for several reasons. First of all, it is clear in the record, both from the separation plan, from the transfer policy, and from Dr. Martin's superintendent's testimony, that there will continue to be desegregation transfers from county into the city system, including the high school. And specifically, that the career tech or vocational training, which Your Honor mentioned, and which was a central concern, I think, of the district court, will, under our plan, continue to be available to county students. Now, the district court took some issue with the idea that tuition would be charged, but the Gardendale system is quite happy to not charge tuition if that is a lesser remedy that the district court would have been willing to consider instead of imposing a fee. Are you sort of amending the plan in front of us? No, Your Honor. In fact, I'm arguing the other reason why it was error for the court to impose a partial injunction on a very large price tag on the county, and that is the tailoring rule on the Brinkman. The problem, Mr. McCloud, is that I think Judge Clevenger's question raises is that it's incumbent on your client to come with the motion, and it's your burden to explain why the creation of that school system won't impede desegregation. And it does appear from the record that this has been a bit of a moving target. Well, Your Honor, let me be as clear as I can. On the tuition, wasn't your original position that you required cash? Your Honor, I mean, you wouldn't take a personal check from a person that wanted to send their children to the school? Your Honor, I believe you're referring to an earlier draft of the transfer policy. Well, that's what I mean, but I mean, just today in front of us, you decided that you'd be willing to waive this or that. You're amending the plan's moving target. And under Ross, I thought the law of this circuit was very clear that the plan had to be specific, tied down, tight, so that the judge could then make a judgment as to what the impact would be on the county. How can you know what the impact on the county is if the target keeps moving? Well, Your Honor, I'm not suggesting that we amend the plan on the fly. I'm suggesting that under Brinkman, the district court was required to tailor the remedy imposed to the nature and extent of the violation. And because the impact, if any, of the transfer of the high school was so minimal, it was error to impose a fee in the tens of millions of dollars. This is not a situation where the district court is dealing with a transfer that has already occurred and then tailoring some kind of remedy to deal with in an after the fact manner. This is whether the district court is going to grant a motion where you have the burden to establish that there won't be a problem, right? Well, that's correct, Your Honor. I believe the record does amply establish that there will not be a substantial adverse impact on the county's desegregation from the transfer of the high school, number one, because the plan that was proposed and the transfer policy did make it clear that the CareerTech program will be available to the county, that we will continue to receive desegregation transfers from the county. But more importantly, the lower court's remedy was legal error because it was not tied to any racially significant or desegregation specific impact. The transfer of the roughly 366 high school students from Gardendale system to somewhere else in the county, which is the only impact the district court found specific to desegregation as it pertains to the high school, was a body of students, 85% of whom are white. In fact, an adverse expert conceded below that several of the county schools will become more racially balanced, though we do not concede that's the goal of desegregation in the first place, as a result of Gardendale separation and that under the plan we proposed, our schools likewise at the end of the 13-year period will be more racially balanced than they are now. So the failure of the district court legally in imposing a bounty on the high school was in failing to tie that remedy to any desegregation specific or racially disproportionate impact from the transfer of the high school. It will continue to be a tool in the county's arsenal because this court mandated in stout in 1972. Did Gardendale submit any evidence on the record as to the financial impact on the county of its creation of a separate school system? I know that the county produced evidence saying that it thought it would have an adverse effect on it and there's a fight here about whether or not we can consider that because of whether or not there was a cross appeal, but my understanding was that part of the obligation of Gardendale was that it had to bring forward and put onto the record its assessment of the financial impact and to be able to demonstrate why the financial impact on the county wouldn't be adverse. And I didn't see any evidence in the record put in by your side on the subject of financial impact. Am I wrong? Respectfully, yes, your honor. I would direct the court's attention to the testimony at trial of Dr. Dennis Veronese. I believe it was day two of trial, but it is there. Gardendale submitted his expert testimony exactly as to what would be the impact on the county's operating budget. And I believe he and the expert, financial expert for the county, who also testified, agreed that the impact on the county's operating budget would be less than 1% of its $266 million annual operating budget. So, yes. What about the obligation of the county to build a new high school? Your honor, I'm glad you brought that up. The lower court seemed to find, although there was some equivocation in the opinion, that the county will be forced  if the high school is transferred. That is unsupported entirely in the evidence. The lower court relied only on the testimony of the superintendent of the county, wherein he opined that in his opinion, desegregation meant that the schools in the county must be safe. If the county has a high school that it built to serve specific needs that it defined for county-wide needs, and that school is gone, lost forever, belongs to Gardendale, and the county wants to replicate that facility, don't they have to build one someplace? Well, no, your honor. The vast majority of the students who are educated today in that high school will continue to be so under Gardendale's administration, and there are only 366 high school students that the county would have to reassign elsewhere, and there was no evidence that they would need to spend $50 million. What's the total population of the high school? The high school, I think, has over 1,000 students, I believe, off the top of my head. I know that there were 366. And what percentage comes from outside of Gardendale? 366 students under Gardendale's plan would have to be reassigned. So, a fairly substantial portion of the student body. I mean, so a third of the student body? As compared to the current high school population, that may be correct, your honor, but the point that I'm making is simply that the county will not need a $50 million facility to educate 366 students, and the county offered no evidence at all. It will need some facility, and whether or not that would have to be in some existing high school that would require additional work, or whether that would be a new high school, it still goes back to Judge Clevenger's question, which is the county would have to do something, right? Well, the county would have to reassign those students, that's correct, but there is not evidence in the record to support the idea. It isn't just those. Those are the students that have transferred into Gardendale from someplace else in the county, and so if you say that 366, there's 600 students in there from Gardendale. Presumably, there are students in the county at large, more students would like to come to this school. I mean, is the 366 number just because there are only 366 kids in the entirety of the county who want to go to get the vocational programs, or because there are 600 Gardendale people who want to be there, and they're filling up the slots? Your Honor, the 366 number are students who under Gardendale's proposed plan would eventually, after the 13 years, not on day one, but at the end of the transition period, be reassigned by the county to other schools because they would not be part of the Gardendale attendance zone. So it is not a day one displacement. It is an over the transition period displacement, and I believe if that answers your question, and there was no evidence below that the county will need to build a shiny new $50 million facility or anything like it at all, and even if that were an impact, 85% of that body of students are white. So the court failed to tie this impact to any desegregation specific or racially significant effect. The second point I'd like to address is- At some point, we need to talk about discriminatory purpose because all of that is really beside the point. If we were, I mean, for you to win, we have to rule that the district court's findings of your failure to establish that the separation won't impede the desegregation of the school system and the finding that there was a discriminatory purpose in moving to create a separate school system were both clearly erroneous. For you to win, you've got to knock down both under a clear error standard. Isn't that right? Well, Your Honor, respectfully, not exactly. Under Arlington Heights itself, footnote 21, the law is that even if, in your hypothetical, this court were to affirm the finding of discriminatory purpose, a finding of discriminatory purpose does not automatically invalidate a governmental decision because the remedy must always be tailored to the nature and extent of the harm. And here, if you examine the- No, no, no, no, no, no. This isn't a finding that- This isn't a concern about an after-the-fact remedy of a constitutional violation. This is the denial of a motion to do something that the district court has found has a discriminatory purpose. And at that point, the district court just denies the motion, right? Well, Your Honor, the district court actually imposed a partial injunction here. I know. That's a different problem. Do you think that- Let's assume for a moment, Mr. McCloud, that you're unable to knock down both of those findings under a clear error standard. The district court had no authority to do that, what it did, did it? Your Honor, respectfully, I think that it did because the tailoring rule under Brinkman and Arlington Heights by the language that I read in those cases is not at all limited to only the scenario where there has already been a concrete harm that has occurred in the past and the court is achieving a remedy ex post facto. That rule applies even where there's been a violation of the Constitution. Certainly, a fortiori, it must apply where there's merely a racial motivation finding. You come in and you want to create a new school system that the district court says is motivated by a racially discriminatory purpose and would impede the desegregation of the Jefferson County school system, both of which the court concludes under clear error standard, the record supports those findings. You're telling me that, so what law empowers the district court at that point then to nevertheless create a partial separation that no party asked for? Where does that come from? Your Honor, I think, again, it arises from the fact that as the courts have instructed, a district court must be sensitive to local conditions and fashion a remedy that is tailored to the facts before it. Here, at least the district court, I believe, was correct in seeing that given the limited extent and nature of the findings it made, both as to impediment and racial motivation, for example, the court noted that many in Gardendale sought separation for non-racial reasons. The court realized that a total injunction as the plaintiffs urged would be inappropriate. It would go too far. It would not be tailored to the harm that was found. And here the district court failed to properly impute to Gardendale. See, I don't get that. I just don't get this. The court has ongoing injunctions, right, that are longstanding here. It's not that it needs to grant any new injunction to cure any violation. It's already got an ongoing remedy to desegregate the Jefferson County schools. The problem in this case is that long after that work began, you move to modify and to allow something different to happen. It's your burden to do that. And the district court found two separate problems, both of which you have to knock down, for you to get that kind of relief. I don't understand why there's a need. No party asked the court to do what it did, right, to remedy any kind of constitutional violation. I don't, I really don't get it where the court gets that authority. What, where can I look in case law that says the district court was empowered to do what it did? Well, Your Honor, if I understand your question correctly, the district court's concern was where would the power be for it to deny Gardendale's motion? Certainly, as the court was examining opposing counsel a moment ago, Wright and Ross and Scotland-Neck and Stout from this case do not authorize a district court. If the district court finds that you failed to satisfy your burden, I don't find any difficulty in understanding where it gets the authority to deny your motion. That's easy, isn't it? Well, Your Honor, I believe the district court, at least in this respect, did correctly read the Wright opinion. It does not command a district court to instantly and completely deny a separation motion if it finds there's some impediment because the question still remains, well, how much is the impediment? Let's ask it this way. It would empower the district court if it so chose to do that, right? I believe Wright would empower a district court to impose some remedy if it found an impediment to desegregation, but not... Again, to deny the motion. Well, I think depending on the factual findings, it could, and that would depend on what were the nature and extent of the findings. And here, those findings do not come close to approaching supporting a complete injunction because the racial motivation finding was based on a half dozen Facebook posts. You're challenging the evidence when you say that. Well, Your Honor, not exactly. I believe the legal error that the court committed here was in attributing to the governmental body, the only body before it, the Gardendale board, the supposedly, and we do not concede, racial statements made by private citizens in the past. Let's cut to the chase on this, OK? Arlington Heights long ago said that there's a mosaic of circumstantial evidence that a district court can look at in determining whether a governmental body has been motivated by some improper discriminatory purpose, some of which can include organized constituent activity that it finds motivated the state actors to act in the way they did, and that the reading of that circumstantial evidence allows an inference that the governmental actors shared that motivation. That's like hornbook constitutional law, isn't it? Respectfully, Your Honor, Arlington Heights does not authorize a district court to look back at the private statements of citizens in the past. The background, the decision, the legislative history of the decision in Arlington Heights was as of the history of that official, that body's official actions, not what the district court did here, which was to look back. The district court in that case looked at what the constituents were arguing to the zoning board or something like that, a planning commission, something like that. And the Supreme Court of the United States said that was, the district court was perfectly within its rights in looking at that, didn't it? Your Honor, I do not believe Arlington Heights authorized the district court to attribute to the governmental body what it believed was racial motivation on behalf of a handful of private citizens. And in that regard, I would direct the court to a Fifth Circuit case, Jones v. Lubbock, 727F2nd364, copies of which I have with me today and I've given to opposing counsel, in which there the Fifth Circuit said even a member of the governmental body, a voting commission, I think in that case, a member of that body had published in a newspaper clearly bigoted racial slurs in the past. And the Fifth Circuit held it was clear error for the district court to attribute to the body as a whole, to a majority of that body, the racial sentiments expressed in the past by that one member because there was no evidence that would allow the district court to infer that his racial animus influenced the body as a whole. And that is the legal error. That's not our record and or our finding. That's a different issue from what we're dealing with here. The district court didn't just look at some Facebook post and make this finding. The district court did it not looked at a lot of circumstantial evidence, some of which included commentary by the organizers of this effort. And it seems to me that Arlington Heights says the district court can look at that commentary as part of what I will call a mosaic of circumstantial evidence. That's like super well-established law, isn't it? Your Honor, I'm afraid that we will, I'll continue to have to respectfully read Arlington Heights differently. But even if the court reads Arlington Heights, as you say, Johns v. Lubbock explains why it was error here, even if the court properly looked at that evidence to attribute it to the official actions of the board in filing a motion to separate when there was no evidence at all. And the court cited none that the supposed racial animus of the Facebook poster of the Focus Gardner influenced. You really didn't even have a board here, did you? I mean, wasn't it a paper tiger? Well, your Honor, the board never met. This plan that went to the district court judge was not apparently read, certainly wasn't approved by the board. So I kind of had the impression that this board was an ephemeris sort of body that sort of floating. Hoped to operate someday. Well, Your Honor, the board was formed in April 2014 and has had meetings every month since then, as far as I am aware. But you are correct in that. April 14 and then the snowball was rolling real fast by then, isn't it? What are the dates? When was the hearing in this case? Well, the trial in this case was December of last year, December of 2016. And the motion to separate was filed with the court in December of 2015. Did I miss something in sort of trying to understand the atmosphere as to what your client's real position is? I mean, would your client rather live with the court's order as it was entered or prefer to have the court to have the plan rejected outright? Yeah. Your Honor, if you're asking me whether Gardendale would prefer to take the partial injunction, you know, the things, status quo, or to suffer a reversal and a total injunction, certainly the former. Let me be clear about that. Our position is simply that it was error to the rules. My understanding, the effect of the order is that Gardendale is going to be under federal court supervision for the well into the foreseeable future, 14 years or so. And so anytime you come back with anything, you're under that supervisory thumb being watched like a hawk. Whereas if this plan is totally rejected, if this court were to say, to decide that it could elide the question of the 14th Amendment violation and say, well, the district court made that ruling, but we're not going to pass on it, it'll be reserved for some future date. But by the way, the plan is totally rejected. You're as back, close back to square one as you could possibly get. Whereas if we were to just affirm across the board and say the plan is fine, your client is locked in to federal court supervision for a long time. Well, Your Honor, as the court addressed earlier, the reason it is necessary and urgent for Gardendale that the court reverse and reach the constitutional violation conclusion is because in the event that there is a later motion, however, it shakes out, that Gardendale comes back to the district court with another motion, another plan, perhaps somewhat different plan, the district court will almost certainly rely on and look back to that violation finding, and it will be hanging over Gardendale's heads as a burden that we... It will hang over your head whether we reach the issue or not, because the district court judge's opinion is rock solid from her point of view until we nudge it. And if we on purpose walk past it, that might create some question in someone's mind about whether the question was close or not up here, but no one knows. But she certainly will continue to exercise her authority under the basis of her independent finding. Well, Your Honor, if this court does not reach the constitutional violation conclusion, I agree that the district court will take that as license to continue to rely on it in future proceedings. And if we affirm, if we find that there was no clear in her findings, she certainly is going to in the future. Well, you have that stick over your head. The violation decision is a legal conclusion reviewed de novo. But yes, the racial motivation finding or the impediment finding of those subsidiary findings that underlie the violation. You understand what I'm saying? Regardless of what the standard of review is, I mean, you understood what I was saying. So it's it just puzzled me in listening to your argument. It sounded like you were defending the court's authority to do what she did. Well, Your Honor, the district court got something right here, and it was to not give the plaintiffs what they urged, a complete and total denial of the motion and a whole injunction of the separation effort. That much, at least, I believe was correct. You keep speaking as if Mr. McCloud, the plaintiffs or the county board, moved for some kind of injunction and it has been granted here. And that's just not the framework we're talking about. You're the one moving the district court, and you're the one asking to upset an already ongoing injunctive relief. And if the district court says, no, you didn't sustain your burden, the district court doesn't enter any new injunction. It doesn't enter an injunction at all. There's already an injunction in place. Well, Your Honor, the court's opinion uses the language that we are partially enjoined. And that is why I made the statement that the court has entered a partial injunction against Gardendale. But it's certainly you could view it technically as merely a partial denial. But you said, though, that the district court would have been wrong to just enjoin the separation entirely. And that's just not the way the framework works. What the district court would be doing is denying your request to allow the separation. Well, Your Honor, I'm not sure if the distinction is consequential to the relief that we get. But I believe in Wright itself, the Supreme Court made it clear that the relief what the district court does is not simply deny a motion. It enjoins. It does create and impose an affirmative injunction to stop a validly created state entity from doing what it has a right to do under state law, to separate and form a district. So I think if you recognize it has no such right. It has no such right to do that unless it first obtains the permission of the district court. Well, Your Honor, that's that's under state law. As I said, there is a right for it to to separate. And the district court only has the authority to prevent that if there is a substantial adverse impact on desegregation or an independent constitutional violation, which is why we addressed all those points in our brief. And if the court has no further questions. Thank you. Thank you, Your Honor. Ms. Lindloos. I won't believe I'll take all of my time unless the court has questions, but I just want to clarify a few points. First, on the Jones v. Lubbock case that Counsel for Gardendale referenced, we just received that case the first time this morning and reviewed it and found and agreed with what the court had said, that it does not fit squarely with the facts of this case. The statements in that case were generally prejudicial as opposed to here, where all of the evidence is squarely about the students who would be excluded or included all about the separation of Gardendale and the intentional discrimination of black students. Next, I wanted to make sure that I was clear on the courts, the district court's understanding and misapprehension of the binding case law. As Judge Clevenger mentioned earlier, Wright, the court seemed to see that Wright allowed for discretion, but that may, that the court relied on, miss the holding. In the holding, it's very clear that it says may not create. And so based on that in the binding 11th third cases, the law is very clear. Denial is mandatory once a finding of discriminatory, sorry, of adverse impact has been made. Let me ask you something about what the decree to language would be here. OK, which was not clear from the briefs. So it would seem. I do wonder whether Mr. McLeod has a point about a necessity, if you're right about this appeal for granting some injunctive relief. That is not only was the district court obliged to based on its findings, either of its findings to deny their motion. But would it not have been, would it have been obliged to then enjoin further efforts by this entity or to order the dissolution of that Board of Education? Oh, what does the case law tell us about that? The case law, from our understanding, seems to make clear that once the court denies the motion that that is the denial of the recognition of the school district and should be sufficient. The court could go further and enjoin, but it's not necessary because what the objectors to the separation, including Jefferson County, the United States and the plaintiffs asked for the relief we sought was for the district court to deny the motion of Gardendale to be recognized. In that recognition, without that recognition under sort of the ruling of the state superintendent of education, Gardendale could not move forward. So what the district court would, you would argue, is obliged to do here is we would be obliged to affirm in part, reverse in part, vacate in part. Would we be required to remand with instructions to do something? I do not believe that this court would have to remand for instructions to do something. I believe this court has the authority to reverse the district court's order with regard to the partial granting of Gardendale's motion. And therefore, but affirm the factual findings and the other related aspects of the order. If we do that, what happens to, for example, my recollection is that the district court judge ordered the Gardendale school district to admit a new member, have a black member on that school board. Is that correct? That is correct. So if the separation plan is, we say she should have just rejected it out of hand. And when you reject it out of hand, it's sort of gone. Does the Gardendale school board still have to exist? And if it exists, does it have, is it living under an injunction to have a new member? No, Your Honor, I believe that if the district court were to deny the motion for the operation of Gardendale school board, the Gardendale school board would no longer operate. The court could go further and enjoin its operation or order its dissolution. But I believe it'd be sufficient in either way for the remedy. What the district court has done here, is it not, is the district court has modified the injunction that is already in place with respect to the Jefferson County school system, right? That's accurate. And so that's why I've been asking these questions. It seems to me that what you do, we would do is affirm in part and vacate in part because it has modified that injunction. And if you vacate that portion of the order that has modified the injunction, then you have returned to the status quo, Andy, right? Your Honor, I believe that would, I would, that would be the appropriate way to resolve the issue. I would just like to note if for clarification's point on the adverse impacts, just the facts of requiring the financial impact, it would actually be $2 million a year loss. And the loss of both that financial impact and also the loss of the facilities, it interferes with what Jefferson County has, which is an affirmative duty to desegregate its schools. And that is the underlying reason why the court should, in fact, deny Gardendale's motion and affirm our appeal. Thank you. Thank you, Your Honor. Nobody should get excited and think that all the arguments are going to go over like that today.